[No. 29587.   *En Banc.*   August 3, 1945.]

ROBERT A. COERVER *et al., Respondents,* v. GEORGE F. HAAB
*et al., Appellants.*[1]

[1]Reported in 161 P. (2d) 194.

*I. J. Bounds,* for appellants.

*Nat. U. Brown,* for respondents.

MALLERY, J.—For a number of months prior to October 15, 1943, the plaintiff Robert A. Coerver and the defendant George F. Haab (who will be referred to hereafter as though they were respectively the sole plaintiff and the sole defendant) were employed at Hanford and lived at Yakima. They entered into an oral arrangement with each other and with three other employees of the Hanford project, who also lived in Yakima, that each of the five would alternate day by day in driving his car from Yakima to Hanford and return, carrying the other four as passengers.

The arrangement provided that if, on any particular day, the party whose turn it was to take his car was for any

reason prevented from doing so, he would notify the other four and one of them would arrange to take his car. In such a case, however, the one who had failed to take his regular turn would make it up at some later time when he was able.

In the event one or more of the parties found it inconvenient to make the trip in the automobile of the one furnishing transportation on a particular day, or if he found it more convenient to find some other means of transportation, there was no obligation upon him to ride in the car of the individual furnishing transportation for the five of them.

On November 20, 1943, under this arrangement, the defendant drove his automobile to and from Hanford for the purpose of furnishing transportation not only for himself, but for the other four men. On the return trip from Hanford to Yakima that evening, they reached Moxee City shortly before five-thirty p. m., it then being about dusk; and at that time a slight mist started to fall.

At a point about one mile west of Moxee City, the highway, which is of "blacktop" construction, makes a right-angle turn to the north, after which it intersects a railroad a few hundred feet farther on. The railroad does not cross at right angles to the general line of the highway, and in order to provide for a right-angle crossing of the tracks, the highway curves slightly to the right just before reaching the tracks on the south side and then curves back to the left on the north side of the tracks to resume its northerly direction.

When the defendant made the right-angle turn to the north and approached the railroad crossing, it was dark, the lights of the car were on, and the pavement was quite wet. The plaintiff was riding in the front seat with the defendant, who was driving, and Peterson and Toman were in the back seat. As the defendant approached the crossing, another automobile was coming toward him from the north. According to the defendant's testimony, he was then driving about twenty-five miles per hour. Mr. Peterson said that he had been dozing, but awakened when he heard the defendant say, "Oh! Oh! Oh!" and he would say that they

were then traveling about twenty to twenty-five miles per hour. The plaintiff said that the speed of their car was then "fairly rapid." He testified further that they would normally travel about fifty miles per hour, and that it was the defendant's habit to slow down when approaching corners and intersections.

As he approached the crossing, the defendant applied his brakes. He testified that the car did not respond to the braking, despite the fact that the defendant pulled the steering wheel to the right, but that it skidded straight ahead onto the railroad tracks and over onto his left-hand side of the highway, where it collided with the other automobile, which was coming from the north. Plaintiff sustained injuries in the collision, for which he sought damages in this action. From a judgment in favor of the plaintiff, defendant appeals.

We quote from the appellant's brief:

"Two principal questions of law are involved: (1) was the relationship between the defendant and the plaintiff that of host and guest, or was it one of paid transportation? (2) was the defendant guilty of any negligence which was the proximate cause of the collision and the consequent injuries to the plaintiff?"

We will consider the second question first. Appellant contends that paragraph 5 of the amended complaint, which reads as follows:

"After the car had made the right angle turn the defendant Haab carelessly, negligently and in violation of law increased the speed to a high and excessive rate, to wit: 50 miles per hour and as a result thereof as said car *approached the railroad track* it became wholly uncontrollable, *crossed to the wrong side of the road and collided head-on with a vehicle driving in the opposite direction*"; (Italics ours.)

alleges only one act of negligence; to wit, driving at the high and excessive rate of speed of fifty miles per hour.

■ To this the respondent points out our repeated holdings that, where the evidence concerning the accident is not objected to, the pleadings must be deemed to have been amended to conform to the proof. Appellant skidded onto the wrong side of the road and there collided with the on-

coming car. Conceding this to be the rule, nevertheless, the appellant contends that the skidding of an automobile is not evidence of negligence and cites *Osborne v. Charbneau*, 148 Wash. 359, 268 Pac. 884, 64 A. L. R. 251; *Cartwright v. Boyce*, 167 Wash. 175, 8 P. (2d) 968; *Martin v. Bear*, 167 Wash. 327, 9 P. (2d) 365; *Wilson v. Congdon*, 179 Wash. 400, 37 P. (2d) 892; *Gayson v. Daugherty*, 190 Wash. 133, 66 P. (2d) 1148; *Weaver v. Windust*, 195 Wash. 240, 80 P. (2d) 766.

The skidding of a car, considered by itself as an isolated factor unrelated to surrounding circumstances, is of course not evidence of negligence. That, however, is a far cry from holding that skidding always constitutes a defense to other proven acts of negligence.

In the case at bar, the appellant collided with another car on his left-hand side of the road. An analysis of the cited cases reveals that, where the proximate cause of the collision was the presence of an automobile on the wrong side of the road, the burden is on the party on the wrong side to show that he was there without fault; and the sufficiency of his excuse is a question of fact for the jury or the court, as the case may be.

The appellant was thoroughly acquainted with the road in question, had driven it for some months, knew that the pavement was wet and the weather misty, and knew that it was extremely slippery when wet. He states that he approached the point of collision at a rate of twenty-five miles per hour. He knew he was approaching a railroad track where the road angled. Apparently, all that he did was to apply the brakes, which caused the car to slip across onto the wrong side of the road and collide with the oncoming car. The collision, occurring on appellant's wrong side of the road, is in itself negligence unless he can explain that he was there through no fault of his own. See *Crowe v. O'Rouke*, 146 Wash. 74, 262 Pac. 136; *Martin v. Bear, supra*; *Haines v. Pinney*, 171 Wash. 568, 18 P. (2d) 496; *Thomas v. Adams*, 174 Wash. 118, 24 P. (2d) 432; *Weaver v. Windust, supra*; *Tutewiler v. Shannon*, 8 Wn. (2d) 23,

111 P. (2d) 215; *Cook v. Rafferty*, 200 Wash. 234, 93 P. (2d) 376.

The trial court's reasoning as to the sufficiency of the excuse is well stated in his memorandum opinion, from which we quote in part:

"In the case at bar, however, there was nothing done by any other person or automobile that created an emergency for the defendant. He testified that he was very familiar with the highway, because he had traveled it twice daily for about seven months. He also stated that he observed the other car approaching, and there is no evidence of any obstruction to the view.

". . . Here, the defendant was traveling at twenty-five miles per hour over a familiar highway, with a slippery 'black top' surface, approaching another car and a railroad crossing where the road swerved slightly to the right. *If at that time the plaintiff's position was dangerous, it was a situation created entirely by himself in traveling at too great a speed to negotiate the crossing and the passing of the other car, under the circumstances then existing.*" (Italics ours.)

We are not prepared to hold that the court erred in finding that the excuse for being on the wrong side of the road was insufficient.

As to the first question, the appellant invokes Rem. Rev. Stat., Vol. 7A, § 6360-121 [P.P.C. § 295-95], which reads as follows:

"No person transported by the owner or operator of a motor vehicle as an invited guest or licensee, *without payment for such transportation,* shall have cause of action for damages against such owner or operator for injuries, death or loss, in case of accident, unless such accident shall have been intentional on the part of said owner or operator: . . ." (Italics ours.)

Appellant contends that, since appellant did not pay the state of Washington for a license to drive a car for hire, and since the department of licenses does not recognize share-the-ride drivers as public carriers, and in as much as such drivers lack many of the essentials required of public carriers, such as certificates, insurance, and special licenses, they should therefore not be treated as having received

"payment for such transportation" as contemplated by the statute.

We have never held that a driver must be a licensed public carrier to receive the payment for transportation that is contemplated by the statute here involved, or that exclusion from the exemption from liability applied only to public carriers.

█ Appellant contends that a share-the-ride plan is not to be considered as benefit to the driver, but rather that it is an aid to the war effort. We think it is both, where a driver receives a ride for giving a ride.

█ The appellant contends that there is no binding obligation or contract between the parties to the agreement, because the defendant could, when it was his turn to ride with one of the other parties, do so or not as he pleased, with none of the other parties having any legal recourse to compel him to do so. The challenge to the validity of a contract for transportation upon the ground that the one paying for it cannot be compelled to take it, is a novelty that arises out of a confusion between the elements of consideration and benefits in a contract. A druggist's right to compel you to pay for the pills you buy is not contingent upon his right to compel you to take them. That the "arrangement" herein had all of the elements of a contract, is scarcely controversial. If it were contended that appellant could have accepted the rides that he did accept with no obligation to repay in kind, we would have a different question. That contention is not made.

█ Even if we were to concede that appellant could withdraw from the arrangement without future obligation, it would avail appellant nothing. We adhere to the rule laid down in 12 Am. Jur. 609, § 114:

"If a bilateral agreement, not originally binding on one of the parties, has been performed by him, so that the other party has actually received the promised benefit, the latter is bound to perform his promise."

Regardless of what the rights of the parties may have been as to the executory part of the contract, it is apparent

that the instant cause of action arose out of the executed part.

■ We hold the appellant was not transporting the respondent "without payment for such transportation" as contemplated by the statute. He therefore does not come under the host-guest exemption from liability.

The judgment is affirmed.

STEINERT, BLAKE, ROBINSON, JEFFERS, and GRADY, JJ., concur.

SIMPSON, J. (dissenting)—I am unable to agree that the evidence in this case proves that the appellant driver was negligent. True, the accident occurred on appellant's left side of the road, but his position there was explained in the following evidence given by him when called as a witness by plaintiff:

"Q. Tell the Court what happened between Moxee City and Yakima that evening. A. Well, we left—we made this right angle turn approaching the intersection of the railroad, coming down there, I applied my brakes, couldn't get any response, I pulled on the wheel just as hard as my wheels would cut, and I made three utters, like 'Oh! oh! oh!' I could see that the accident could not be avoided. Q. Where was your car then, when you saw that, Mr. Haab? A. I would say approximately 80 foot from the place of collision. Q. And what part of the road were you on, relative to your right or left? A. On the right side of the road. Q. Go ahead. A. And the railroad comes across there and, of course, the road makes a slight curve there so as to make a direct right angle across the railroad track, which places the right-hand side of the road on this side of the track in direct parallel line with the road, with the left-hand side coming down this way. So, when I applied my brakes and cut the wheel, I naturally became frightened and I shouted that way 'Oh! oh! oh!,' just a little before the accident occurred. Of course, we met. . . . Q. How fast were you traveling at the time you put on your brakes? A. Approximately 25 miles an hour."

This evidence demonstrates that appellant was driving at a moderate rate of speed at the time he approached the turn of the road. He, as any prudent person would, applied his brakes in order to make the turn without injury to him-

self or to others. The skid was unexpected and not the result of intention or recklessness.

In *Wilson v. Congdon,* 179 Wash. 400, 37 P. (2d) 892, this court considered a case where the facts showed that a car skidded onto the wrong side of the road while being driven at a rate of thirty to thirty-two miles per hour on the right side of the wet "black top" pavement. In passing this court stated:

"There is no evidence that appellant's automobile was at any time operated on the wrong side of the highway. That vehicle skidded from its own right-hand side of the highway to the extreme left-hand side of the highway, where it was struck by respondent's automobile.

"The failure of the driver of a motor vehicle to keep to the right side of the highway is excused where, without fault on his part, the machine skids across the center line of the road, but where skidding results from negligence, the driver is liable."

The decision in the case just cited is determinative of the one at bar. I agree with the cited case and disagree with the holding of the majority in this case. Skidding is not of itself indicative of reckless driving. In order to hold a driver guilty of negligence it must be shown that he was negligent just prior to and at the time his car skidded. The facts are not disputed, and we have the same opportunity to ascertain the liability of the appellant as did the trial court.

The burden of proof of negligence and of approximate cause never shifts, but remains with the one alleging it. The rule is properly stated as follows:

"Furthermore, the burden of proving negligence by a preponderance of the evidence rests upon the party alleging it, and the party charged is not required to assume the burden of proving that he was not negligent, but is only required, in response to a *prima facie* case of negligence made against him, to come forward with evidence excusatory of his negligence. The extent to which he must go in that respect is only to the point of producing evidence sufficient to balance the scales upon that issue. Beyond that point, he is not required to go. The original burden of proving negligence by a preponderance of the evidence re-

mains throughout the case upon the party charging negli-gence." *American Products Co. v. Villwock,* 7 Wn. (2d) 246, 109 P. (2d) 570, 132 A. L. R. 1010.

I contend that in any event appellant is not liable to re-spondent because respondent was a guest riding as such in appellant's car. Rem. Rev. Stat., Vol. 7A, § 6360-121, provides:

"No person transported by the owner or operator of a motor vehicle as an invited guest or licensee, without pay-ment for such transportation, shall have cause of action for damages against such owner or operator for injuries, death or loss, in case of accident, unless such accident shall have been intentional on the part of said owner or opera-tor: . . ."

The question presented is: Who is an "invited guest or licensee, without payment for such transportation," within the meaning of the statute?

. The so-called contract or agreement made between the workers is shown by the following undisputed testimony: .

"Q. Now, what discussion did you have, say, with Mr. Coerver, relative to driving back and forth in your different cars? A. No particular discussion, other than—the same formality that we all had was that we would share our cars and one would drive one day and one would drive the next, and so on. Q. And that made it about every fourth or fifth day you would use your car, and the other days they would use their cars? A. We would try to keep it in sequence, yes. . . . Q. The day that you drove the car, you paid all the—for the gasoline and oil, the day you used your own car? A. Yes, sir. Q. And that was true of the others when they—A. (Interposing) Yes, sir. . . . Q. Mr. Haab, now, back to your agreement or understanding, was there any obligation on each of you to go? Could you go in another car, and did you, at different times, go in another car, take a bus, or use your own car, when they weren't with you? In other words, did they have to ride with you or you ride with them? A. Oh, no, sir. At times, if we deemed it inconvenient, that we had to work overtime, or probably some—I told the crowd not to come for me, I was going to drive my own car that next day, or vice versa with the others. Q. No obligation what-ever, if it wasn't convenient to go they didn't need to go,

no obligation for them to go, if they didn't want to? A. No, sir. Q. And that happened frequently? A. Not quite frequently, no, but it did happen. . . . Q. Now, back to this agreement again, just one thing. As I understand it, you tried to rotate this; each fourth day you'd drive; is that right? A. That's right. Q. But if one of them wasn't going out, you passed him up, or if he had to stay late out there for some reason? A. That's right. Q. He got other transportation. But just how frequent was that, that one of you had to get other transportation? A. Oh, it was very rare. . . . Q. Sometimes the car of one of them would be out of order for two or three days, during that time they'd ride in one of the other cars? A. That's right, in that case, someone would ride (drive) for him and then, when his car got in shape, why, he would take up the ride set down for him. Q. Make up the off time? A. That's right. . . . Q. Now, you say that it wasn't compulsory, no obligation for you to furnish your car, or ride with the others? A. None whatsoever. Q. It was entirely up to you, voluntary? A. Voluntary, that is correct. . . . Q. My point is this. There was no penalty, payment of any, if it wasn't convenient for you to ride with any of the other boys, you could take your own car, you could take a bus, or get other means of conveyance? A. That is correct. Q. There was no obligation on your part to go if you didn't want to go? A. None whatsoever. Q. That is the same with the rest of the boys? A. That is correct."

In order to relieve the passengers from the provisions of the "guest" statute there must exist a binding, enforcible contract between the parties, by the terms of which the driver of the car can be compelled to transport the passengers. *Hale v. Hale*, 219 N. C. 191, 13 S. E. (2d) 221.

A study of the facts presented in this case show clearly that no "binding, enforcible" contract was entered into by the parties to this action. Each of the parties could go with another if he so desired. He could use his own car. He could ride upon the bus, or not go at all. And in so doing he would not be responsible to any of those who entered into the so-called agreement. Under the arrangement the passengers in the cars of the workers were there at the voluntary invitation of the drivers and were mere guests. All that the agreement provided for was a mere exchange of courtesies.

The following statement in *Bushouse v. Brom,* 297 Mich. 616, 298 N. W. 303, is in line with my thought:

"There never was a definite meeting of minds between these parties which resulted either in an implied or express legal obligation on the part of plaintiff to pay defendant. Had there been such an agreement and thereafter defendant had neglected or refused to take plaintiff on the trip, it would follow plaintiff would have had an action at law for breach of the contract; but under the facts of the instant case it would surely be farfetched to conclude that plaintiff would have had such a cause of action if defendant had failed to take plaintiff on the trip."

Directly in point and decisive of the issues presented in the case at bar is the following decision of the supreme court of the state of Michigan, reported in *Everett v. Burg,* 301 Mich. 734, 4 N. W. (2d) 63:

"Six fellow employees arranged for daily transportation from Saline, Michigan, to their place of employment at Milan. Five of them, including plaintiff's decedent, Richard Ward, owned cars. They agreed that they would alternate each week in the use of their cars so that each of them would furnish transportation to the others in his turn. One of the parties not having a car agreed to pay the driver, whoever he might be, the sum of 75 cents a week for transportation. On September 17, 1940, Richard Ward, one of the parties, met his death, the car being driven by defendant George E. Burg, who agreed to furnish transportation for the group that week. The special administratrix of the estate brought suit against Burg for alleged negligence. At the opening of the trial, plaintiff's attorney stated the arrangements as to transportation. There was no gross negligence claimed.

"The sole question is whether decedent was a passenger for hire or a guest passenger, or whether he and his driver were engaged in a joint venture. It is conceded that if the relationship was not one of passenger for hire, plaintiff cannot recover. Defendant moved for a directed verdict on the ground that plaintiff's opening statement did not state a cause of action. The court entered a judgment for defendant.

"While there is some claim that the relationship was one of joint venture instead of that of host and guest, it was in no event that of passenger for hire. It was simply the ex-

change of amenities between fellow employees. Plaintiff heavily relies on *Peccolo v. City of Los Angeles*, 8 Cal. (2d) 532 (66 Pac. [2d] 651). While there is a superficial resemblance, an examination of that case shows that the parties were not fellow employees at all and the cars belonged to the employers, not the employees. We think this case, on its facts, more nearly resembles that of *Fisher v. Johnson*, 238 Ill. App. 25, wherein the court said:

" 'We regard the circumstances in no different light than if on each occasion when one drove the other in his car to and from their place of business it was upon an express invitation from the former to the latter to be his guest, and therefore negligence could not be imputed to the latter on the theory that because they were accustomed to exchange courtesies and ride together they were engaged in a joint enterprise or undertaking.'

"Practically every interchange of amenities and hospitality, when very carefully analyzed, may appear to be a *quid pro quo* arrangement, but this does not prevent the relationship from being that of host and guest.

"The trial court was correct. Judgment for defendant affirmed, with costs."

Accord: *Miller v. Fairley*, 47 N. E. (2d) (Ohio App.) 243.

An interesting article on the "guest" statute has been written by Professor John W. Richards of the Washington Law School in 15 Wash. L. Rev. 87.

The judgment should be reversed.

BEALS, C. J., and MILLARD, J. (dissenting)—We concur in the view that respondent was a guest, which relieves appellant of liability.