264 P.2d 698

**RIGGS v. ROBERTS.**
No. 7965.

Supreme Court of Idaho.

Dec. 14, 1953.

Joseph M. Imhoff, Jr., Walter M. Oros,. Boise, for appellant.

Karl Jeppesen, Boise, for respondent.

GIVENS, Justice.

Appellant sued respondent for injuries suffered by him in an accident while riding in respondent's automobile, driven by him, alleged in the amended complaint to be caused by respondent's negligent operation of the automobile, in that the left rear tire was smooth, worn, and inadequate in tread for braking power and ordinary use; that

the usage of said tire for speed at 65 miles per hour was gone and its fabric strength was impaired by age, hard usage and road heat; that the tire could not stand speed at 65 miles per hour on a black top highway, carrying passenger weight of 700 pounds and automobile weight of 4,000 pounds—all of which was known to respondent; that because respondent had failed to maintain said automobile and equipment, failed to warn appellant of this condition and that the speed at which he drove was not careful, prudent, reasonable or proper and that he drove without due caution and circumspection after the tire blew up; that he knew or should have known the tire would be apt to blow up, whereby respondent was guilty of negligence; detailing appellant's injuries.

The original complaint, in substance, alleged appellant orally agreed to pay respondent $1.50 per day to defray the cost of his round trip transportation. The amended complaint reiterated the substance of this allegation.

During the course of the trial, appellant's motion to amend this allegation as follows, was denied:

"* * * That for some time prior to, and on September 9, 1951, it was the custom, usage, practice and general understanding between co-laborers that any laborer employed at said dam, riding in the automobile of another, would pay a nominal cost to help defray the expenses of transportation incident to the use of said automobile to and from said job, all of which said defendant was well aware. That said plaintiff was invited to ride in the defendant's automobile, pursuant to such custom, usage, practice and general understanding, by the defendant through general knowledge and through a third person Jess Busby, * * *."

■ This amendment, attempting to inject a new feature, was addressed to the sound discretion of the court. The excuse given, namely that the amended complaint of May 16, 1952, was not verified by the plaintiff, it not being shown who did verify it, though the Clerk's record thereof says "(Duly Verified)" is inadequate. Such purported excuse is too unsubstantial to justify holding the court abused his discretion in denying the amendment. Ausich v. Frank, 70 Idaho 494, 222 P.2d 1073; Leete v. Griswold Post No. 79, American Legion, 114 Conn. 400, 158 A. 919; Melcher v. Adams, 174 Or. 75, 146 P.2d 354; Vogrin v. Bigger, 159 Kan. 271, 154 P.2d 111; Fralick v. Mercer, 27 Idaho 360, 148 P. 906; Durant v. Snyder, 65 Idaho 678, 690, 151 P.2d 776.

■ The offers of evidence anent custom were properly refused, since there was no pleading to justify them. Singh v. McKee, 38 Idaho 656, 225 P. 400; Smith v. Laflar, 137 Or. 230, 2 P.2d 18.

At the conclusion of the case, evidence having been introduced by both respondent and appellant, the court granted a nonsuit, first recognizing that the burden was upon appellant to prove negligence generally if

he were a passenger, i. e., had given something of value in exchange for his transportation; and reckless disregard if a guest, Section 49–1001, I.C. (intentional accident or intoxication not involved herein), then analyzed the situation as follows:

"Now, on a motion for nonsuit, as counsel for both sides know the evidence and all inferences which may be deducted from that evidence most favorable to the plaintiff must be resolved in the plaintiff's favor. Well, now, let's see just what we have in this case.

"We start out at once with the rule of law that from the happening of an accident alone negligence cannot be presumed, which is just another way of saying that the burden of proving negligence is on the moving party, that is, the plaintiff, and we see in this case that the plaintiff's evidence could only produce one conclusion in the mind of a reasonable man. We have evidence here as to the condition of the tire. Plaintiff contends that the tire was defective, patently defective, and yet his own witnesses here say that the tire had a tread on it, that there were no breaks in it other than the break caused by the blowout or resulting from the blowout, and that it had about 20 per cent. of its life remaining. That, substantially, is the evidence of the condition of the tire.

"The other basis for negligence is that of the manner of the driving of the automobile both before and during the time of the blowout. Our Legislature has said that a person may travel at any speed so long as his conduct is careful, having regard to all of the conditions which exist. They have not arbitrarily said it is evidence of negligence to proceed over or above a certain speed, and it is common knowledge that speeds of 60 to 70 or even 80 miles an hour are indulged in by persons whom we ordinarily regard as reasonably careful or prudent. So that in itself a speed of 65 miles an hour in this case does not afford evidence of negligence; and as to the manner of driving of the car after the blowout, there is nothing here to show that the defendant negligently induced this condition or situation or that he did not act reasonably after the blowout, in view of the fact that he had not caused it to occur.

"It is true that the plaintiff has shown evidence which should go to the Jury as to injuries; he has been badly injured here, but before the Jury is entitled to sit in a case it must be shown, sufficiently at least, that the defendant has been guilty of the condition which produced the accident.

"I am of the opinion here that the plaintiff has failed of this burden and

that therefore there is nothing to submit to the Jury. The Motion for nonsuit will be granted."

■ In effect, two questions are thus presented by the parties herein: the first, of a dual nature, whether the evidence shows appellant was a passenger or merely a guest (we adopt the meanings now commonly used in cases of this nature—passenger, one riding for compensation; guest—no compensation); second, whether there was ordinary negligence or reckless disregard on the part of respondent.

■ The courts have quite uniformly held that merely paying for gas and oil or sharing the payment for gas and oil is not of itself and alone sufficient to establish passenger status. Elliott v. Behner, 146 Kan. 827, 73 P.2d 1116; Whitechat v. Guyette, 19 Cal.2d 428, 122 P.2d 47.

The authorities likewise are quite uniform to the effect that to constitute one a passenger, not a guest, while the consideration need not be payment of money, there must be contributed by the passenger to the driver of the car something substantial and of worth to the driver, i. e., commercial, not mere courtesy. Albrecht v. Safeway Stores, 159 Or. 331, 80 P.2d 62. This payment or consideration may be made by the passenger or someone else. In other words, the driver must be actuated by a benefit of substantial value, not mere courtesy or kindness or recognition of the amenities or friendship, regardless of whether the one riding in the car or someone else pays or contributes this consideration, to make the rider a passenger. Melcher v. Adams, 174 Or. 75, 146 P.2d 354; Fuller v. Tucker, 4 Wash.2d 426, 103 P.2d 1086; Eubanks v. Kielsmeier, 171 Wash. 484, 18 P.2d 48; Elliott v. Behner, 146 Kan. 827, 73 P.2d 1116, supra; Ausich v. Frank, 70 Idaho 494, 222 P.2d 1073, supra.

Furthermore, the authorities indicate there must be a mutual understanding, reasonably clear to both the rider and the driver before the trip is undertaken, that the rider's relationship to the driver is that of a passenger and not a mere guest. Sprenger v. Braker, 71 Ohio App. 349, 49 N.E.2d 958.

"What was intended originally as a gratuity, cannot subsequently be made the basis of an obligation." Hasbrook v. Wingate, 152 Ohio St. 50, 87 N.E.2d 87, at page 91, 10 A.L.R.2d 1342.

■ The authorities also are rather uniform to the effect that where the respective parties are in a car pool or share-the-ride arrangement, i. e., for alternate periods each drives his automobile and transports the other, there is sufficient consideration to make each as to the other when riding in the other's automobile, a passenger and not a guest. Peccolo v. City of Los Angeles, 8 Cal.2d 532, 66 P.2d 651; Coerver v. Haab, 23 Wash.2d 481, 161 P.2d 194, 161 A.L.R. 909; Kelly v. Simoutis, 90 N.H. 87, 4 A.2d 868; Miller v. Fairley, 141 Ohio St. 327, 48 N.E.2d 217.

The issues and evidence are to be considered in connection with the amended complaint.

The evidence quoted below is all, as to any arrangement between respondent and Busby or through Busby and appellant as to how appellant came to be riding with respondent:

Robert's testimony:

"Q. But in any event Busby told you he was obligated to take Riggs back? A. Not obligated. He said that he had promised.

"Q. And he told you that either before the trip was started by you to the Dam or enroute? A. Yes.

\*    \*    \*    \*    \*    \*

"Q. And enroute to the Dam that particular night you knew that you had to take Riggs back with you? A. I didn't have to; I said I would.

\*    \*    \*    \*    \*    \*

"A. I didn't say he was obligated, because I don't even know that he had a week-end car pool. I told you there that he had promised Cliff a ride home, and if I didn't want to take him he would get Cliff another ride home.

"Q. That Busby would take his car? A. No. To the best of my knowledge there were several cars coming. I don't remember that part of the conversation.

\*    \*.    \*    \*    \*    \*

"Q. What I'm trying to get at, Sir, is before you started the trip from Mr. Busby's home at Boise—I'm trying to find out if he didn't acquaint you with the fact that he, Busby, had to take Riggs back that week-end? A. I have no recollection of it.

"Q. It could have been, Sir? A. It could have been, but I don't know.

"Q. But in any event he had acquainted you with the fact that he, Busby, was taking Riggs back in his car? A. Some time before we got to the Dam."

Riggs Testimony:

"Q. Did you use your car to go to and from the Dam? A. I did for awhile when I first started, and then Mr. Busby and I changed rides. I drove my car and he drove his, and then I stayed up at camp and worked the night shift, but I would go to work at 7:00 on Monday and work until Sunday morning until 5:00 for quite some time, and then they cut it down to eight hours on Saturday nights and we got off at 3:00 o'clock then.

\*    \*    \*    \*    \*    \*

"Q. Now, when did you cease using your automobile for transportation to and from the Dam? A. I couldn't tell you exactly but, you will pardon me, I have a grown daughter and she wanted the car, so I looked for other rides, so I rode with Mr. Gaskill quite a bit and quit taking my car, and I rode with Mr. Busby some, because I only

went out on a Monday and came back Saturday.

"Q. What was your arrangement with Mr. Busby? A. It was understood between us I paid the gas. I would ride out with him on Monday and come back Saturday.

"Q. That is just on the week-ends? A. Yes.

"Q. And you were relying on Mr. Busby or Mr. Gaskill to furnish you transportation? A. Yes, sir; whenever they told me they would, they always did.

"Q. And you helped defray the gas? A. Yes.

\*    \*    \*    \*    \*    \*

"Q. Now, did you make arrangements with Mr. Busby to ride back with him on the week-end of September 9, 1951? A. When we rode out that Monday he said, 'Now, you can ride in with me Sunday morning.' To the best of my knowledge that is what was said, and that had been the custom before and, of course, I expected it. I could always depend on him when he said that.

\*    \*    \*    \*    \*    \*

"Q. Did you have any conversation before you got in that car with Mr. Roberts? A. He probably said that he had room or something. I don't know. I don't just remember what the conversation was.

"Q. Did you have any conversation with Mr. Busby as to what means of transportation you would have back to Boise? A. Yes, I did.

"Q. What did Mr. Busby tell you about the means of transportation? A. He told me that before, he said, 'Cliff, I didn't bring my car. I came up with Jeff, and he said there would be room for you.' That is why he didn't take his car.

\*    \*    \*    \*    \*    \*

"Q. Now, Mr. Riggs, I believe you stated that this night of this accident, September 9th, was the first occasion you had ridden with Jeff Roberts here? A. That's right; yes, sir.

"Q. And that at that time you had no conversation directly with him about the ride? A. Not directly with him; no, sir.

"Q. You did talk to Mr. Busby and asked if he had arranged it? A. I rode out with Mr. Busby.

"Q. That was on the Monday previous? A. On the Monday previous, and I was planning on riding back with him on Sunday morning, and Mr. Busby came over and said that he had talked to Mr. Roberts and he said there would be room for me. There would be room for me.

"Q. That was all that was said about the transportation? A. That

is all I remember at that particular time."

Busby's testimony:

"A. Before I met Mr. Roberts down there Mr. Riggs and I were both staying out at the Dam, and we was out there and started to work, and the first couple or three weeks that I knew him that is where I met him, and we agreed he would drive his car and keep it out there during the week, and I would go home and I would ride with him and the next week I would drive my car and I would take him and he would ride with me. That was cheaper. In about three weeks time, I don't just remember, I meantime was taken sick. After the examination they found I had ulcers, so in order to be doctored I had to stay in town and drive back and forth to work, and Mr. Riggs stayed down there, so that period of time I was driving back and forth every day, and during that week, why, I talked to Mr. Roberts about trading with his car to make these trips so it wouldn't be so expensive for me, and it.so happened on the day it was my turn to bring Mr. Riggs home it was Mr. Roberts' turn for me to ride with him.

\* \* \* \* \* \*

"Q. Tell us the conversation you had with Jeff Roberts on that afternoon before you started out for work. A. Well, there wasn't much of a conversation. All I mentioned to him was that I mentioned the fact to him that I should probably take my car because I owed a man a ride back.

"Q. You owed a man a ride back? A. I didn't mention any name, and he said he had plenty of room and in that way he would be paying me for my ride.

"Q. Did he say anything about he could take this man? A. Yes.

"Q. And you owed Mr. Riggs a ride back from the Dam? A. That's right.

\* \* \* \* \* \*

"Q. Tell us how Riggs knew about riding back in the Roberts car after the shift. A. Well, after I had rode out with Mr. Roberts, and he told me that he would bring this party in, why, some time during the shift—I don't remember just when—I got a chance and run into Mr. Riggs and I told him that I didn't bring my car but I had rode with Mr. Roberts and we had room to take him home."

Gaskill's testimony:

"A. Mr. Busby said to Mr. Roberts that if Mr. Roberts didn't have room for Mr. Riggs in his car, he would take his car to the Dam that Saturday, and this happened about five o'clock in the afternoon in front of Busby's house, and Mr. Roberts says that he had room to haul Mr. Riggs in; so we all got in the car and went to work."

Busby unequivocally testified it was his turn to ride with Roberts; he then tes-

tified Roberts said by taking Riggs he would be "paying me for my ride." What ride? At that time, by Busby's testimony, Roberts owed Busby only the duty or obligation to take him back to Boise, which he started to do and was doing when the accident occurred. What ride was Roberts paying for? One in the future? If so, what one-way ride, when Busby and Riggs had been making round trips? Such speculation is too uncertain to convert Riggs into a paying passenger. Such analysis does not disclose any conflict in the evidence, merely that appellant did not sustain the burden of proof resting on him to establish that such consideration passed to respondent for transporting appellant on this trip as to make him a passenger, not a guest.

Conceding a third party may pay consideration to a driver for a ride furnished another in such a way as to make the rider a passenger, nevertheless, the evidence herein fails to show it was the understanding either on the part of Riggs or Roberts that because Busby was fulfilling an obligation in taking Riggs back to town, having brought him out on Monday, that thereby there can be imputed to either Riggs or Roberts an understanding on the part of Roberts he was thereby fulfilling a material obligation to Busby. If, on this trip, Bushy had not been a passenger, there might be merit that by taking Riggs, Roberts was fulfilling an obligation to Busby, but Busby as well as Riggs rode in the car on this trip.

There is absolutely no evidence in the above that appellant agreed directly or indirectly to pay respondent $1.50 per day to defray cost of his transportation from the Dam to Boise on the day of the accident or otherwise or at all. Furthermore, the above record does not disclose there was any agreement, direct or implied, even inferring a consideration moving from either appellant or Busby to respondent for this one-way trip by which appellant was transported from the Dam to Boise. Whatever arrangement there had been between appellant and Busby was for round-trip transportation, not one way. The evidence, therefore, does not support any contention that appellant was other than a mere guest. 60 C.J.S., Motor Vehicles, § 399(5)b, p. 1011.

■ Under these circumstances, therefore, it was incumbent upon appellant to prove respondent, in the upkeep or operation of his automobile, was guilty of reckless disregard. Section 49–1001, I.C. The only incidents relied upon by appellant to prove this are, the worn condition of the tire, speed, weight, and warm weather.

The following authorities, relied upon by appellant to show these constituted reckless disregard, are distinguishable:

Shams v. Saportas, 152 Fla. 48, 10 So.2d 715—wet and slippery.

Waller v. Hipp, 208 N.C. 117, 179 S.E. 428—slippery, slick; smooth tires.

Layman v. Heard, 156 Or. 94, 66 P.2d 492—icy road.

Waters v. Markham, 204 Wis. 332, 235 N.W. 797—not shown to have been more than ordinary.

Smith v. Williams, 180 Or. 626, 178 P.2d 710, 173 A.L.R. 1220—slippery roads.

Henry v. Strobel, 94 Colo. 492, 31 P.2d 319—ordinary negligence alone appears.

Jensen v. Jensen, 228 Wis. 77, 279 N.W. 628—not more than ordinary is shown.

Grant v. Matson, 68 S.D. 402, 3 N.W.2d 118—speed, tires, rough road.

Dostie v. Lewiston Crushed Stone Co., 136 Me. 284, 8 A.2d 393—not shown more than ordinary—worn tire.

Ragsdale v. Love, 50 Ga.App. 900, 178 S.E. 755—not shown more than ordinary.

Knutsen v. Dilger, 62 S.D. 474, 253 N.W. 459—speed and oversized tires; not shown more than ordinary.

The authorities in point, i. e., as to worn condition of tires and speed, with heat and weight, that have been called to our attention, hold such negligence is only ordinary negligence: Whitechat v. Guyette, 122 P.2d 47, supra; Mason v. Mootz, 73 Idaho 461, 253 P.2d 240; Sherman v. Frank, 63 Cal.App.2d 278, 146 P.2d 704, 705; Delair v. McAdoo, 324 Pa. 392, 188 A. 181; Spates v. Gillespie, 191 Minn. 1, 252 N.W. 835; Crupe v. Spicuzza, Mo.App., 86 S.W. 2d 347; Anderson v. Anderson, 188 Minn. 602, 248 N.W. 35; York v. York, 212 N.C. 695, 194 S.E. 486.

The record showing appellant was only a guest and there was at most only ordinary negligence, the judgment of nonsuit was properly entered. Costs awarded to respondent.

PORTER, C. J., and TAYLOR, THOMAS, and KEETON, JJ., concur.