BRENDA BREWER, *Appellant*, v. MARK D. COPELAND, ET AL, *Respondents.*

*Nashem, Prediletto, Brooks & Schussler* and *Terry A. Brooks*, for appellant.

*Michael M. Corless* (of *Salvini & Corless*), for respondent Copeland.

*Richard L. Wiehl* (of *Halverson, Applegate, McDonald, Bond, Grahn, Wiehl & Almon*), for respondent Mid-Century Insurance Co.

HOROWITZ, J.—This is a host-guest automobile accident case tried to the court. Plaintiff appeals the judgment dismissing her action for damages because of failure to prove gross negligence proximately causing her injuries as required by RCW 46.08.080, Washington's host-guest statute. The principal question is whether the statute is constitutional. We uphold the statute, find no other errors as assigned and affirm the judgment of dismissal.

The relevant facts are these: At approximately 2 a.m., November 14, 1971, defendant Mark Copeland was driving a car on Newquist Road, a public highway in the Satus area of Yakima County, Washington, with a car full of passengers returning from an evening dancing party all had at-

tended. Plaintiff Brenda Brewer was being driven home. Her status as a nonpaying guest is not disputed.

Proceeding east on the Newquist Road just south of the point where that road intersects with Highway 22, the car approached a gradual curve in the road. The night was dark, and the road surface wet with rain. There were no distracting influences in the car and there were no irregularities in Copeland's driving. Copeland was unfamiliar with the road. The posted speed limit in the road area under consideration was 50 miles per hour. There was a posted "curve sign" giving notice of an impending curve without other warning of an existing hazard requiring a reduction in the posted speed limit to negotiate the curve. Copeland neither saw the curve sign nor the curve ahead. Unaware of the impending curve, he entered the curve at a speed of 50 miles per hour. Instead of following the curve, he proceeded straight ahead, left the roadway and crashed. Plaintiff was seriously injured. She later brought the instant action against defendant Copeland and Mid-Century Insurance Company, the liability insurance carrier, the latter having claimed the policy did not cover the accident.

The court dismissed plaintiff's action. It found Copeland guilty of ordinary negligence only and not guilty of gross negligence. She appeals.

Her assignments of error revolve about the issue of gross negligence. RCW 46.08.080 provides:

> No person transported by the owner or operator of a motor vehicle as an invited guest or licensee, without payment for such transportation, shall have cause of action for damages against such owner or operator for injuries, death or loss, in case of accident, unless the accident was intentional on the part of the owner or operator, or the result of said owner's or operator's gross negligence or intoxication, and unless the proof of the cause of action is corroborated by competent evidence or testimony independent of, or in addition to, the testimony of the parties to the action: *Provided*, That this section shall not relieve any owner or operator of a motor vehicle

from liability while it is being demonstrated to a prospective purchaser.[1]

Plaintiff contends the statutory gross negligence requirement denies her equal protection under the federal and state constitutions. U.S. Const. amend 14; Const. art. 1, § 12. In support she advances arguments in many respects similar to those relied on in *Brown v. Merlo*, 8 Cal. 3d 855, 506 P.2d 212, 106 Cal. Rptr. 388 (1973), invalidating California's host-guest automobile statute. Those arguments are summarized in *Cannon v. Oviatt*, ............ Utah ............, 520 P.2d 883 (1974). The California statute permits a nonpaying automobile guest to recover against his host driver only for " '. . . the intoxication or willful misconduct of the driver.' " *Brown v. Merlo, supra* at 862 n.3. In that respect, the statute differs from RCW 46.08.080 which also permits recovery for the host driver's gross negligence.

In contending RCW 46.08.080 violates plaintiff's equal protection rights, plaintiff undertakes a heavy burden of persuasion. *Justice v. Gatchell*, 325 A.2d 97, 102 (Del. 1974). She must overcome the presumption of constitutionality beyond a reasonable doubt. *Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n*, 83 Wn.2d 523, 520 P.2d 162 (1974); *State v. Perrigoue*, 81 Wn.2d 640, 503 P.2d 1063 (1972); *Water Dist. 105 v. State*, 79 Wn.2d 337, 485 P.2d 66 (1971). When a statutory classification is challenged, it is presumed that facts sufficient to justify the classification exist. *Sonitrol Northwest, Inc. v. Seattle*, 84 Wn.2d 588, 528 P.2d 474 (1974); *Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n, supra*; *State v. J-R Distribs., Inc.*, 82 Wn.2d 584, 512 P.2d 1049 (1973); *State v. Persinger*, 62 Wn.2d 362, 382 P.2d 497 (1963). Merely challenging the wisdom or expediency of the statute is not enough. *Washington State School Directors Ass'n v. Department of Labor & Indus.*, 82 Wn.2d 367, 510 P.2d

---

[1]RCW 46.08.080 together with RCW 46.08.085 and RCW 46.08.086 were repealed a little more than 2½ years after the accident here. Engrossed Senate Bill No. 2046, Laws of 1974, 1st Ex. Sess., ch. 3, p. 2, effective 90 days after the legislature adjourned, i.e., July 24, 1974.

818 (1973); *State v. Conifer Enterprises, Inc.*, 82 Wn.2d 94, 508 P.2d 149 (1973); *State v. Scheffel*, 82 Wn.2d 872, 514 P.2d 1052 (1973); *Petstel, Inc. v. County of King*, 77 Wn.2d 144, 459 P.2d 937 (1969). A change in public opinion concerning the desirability of the statute is insufficient. *State v. Grabinski*, 33 Wn.2d 603, 206 P.2d 1022 (1949).

■ If the policy is fairly debatable, the legislative remedy for dealing with the evil involved is within its competence. *Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n, supra; State v. Scheffel, supra; Reesman v. State*, 74 Wn.2d 646, 445 P.2d 1004 (1968). In dealing with that evil, the legislature is not bound by decisional law or by the doctrine of stare decisis. It may change that law as, for example, the legislature did when it abolished the theretofore existing right of action for gross negligence in host-guest automobile cases (Laws of 1933, ch. 18, p. 145; *Shea v. Olson*, 185 Wash. 143, 53 P.2d 615, 111 A.L.R. 998 (1936)); and when it later reinstated the right of action for gross negligence by the nonpaying guest against his host (Laws of 1957, ch. 132, p. 484), and then when it repealed the host-guest automobile statute by Laws of 1974, 1st Ex. Sess., ch. 3, p. 2.

Moreover, plaintiff's burden is not diminished by the fact that *Shea v. Olson, supra,* upheld Washington's first host-guest statute (Laws of 1933, ch. 18, p. 145) against an equal protection attack. *See also Nogosek v. Truedner,* 54 Wn.2d 906, 344 P.2d 1028 (1959). In *Freehe v. Freehe,* 81 Wn.2d 183, 500 P.2d 771 (1972), the court, in rejecting the argument the abolition of the doctrine of interspousal immunity would encourage fraud, pointed out the legislature could deal with the fraud problem as it had in enacting RCW 46.08.080, .085, and .086—an indirect recognition of the continued validity of those statutes. Moreover, the majority of the cases in this country have upheld the constitutionality of legislative distinctions between paying and nonpaying guests in automobile host-guest statutes. Some of these statutes have abolished the nonpaying guest's right of action for negligence, ordinary or gross, and others have per-

mitted the nonpaying guest to recover upon a showing of gross negligence. *See* illustrative cases cited in the margin.[2] Although in several cases the courts have followed *Brown v. Merlo, supra,*[3] the majority of cases have refused so to do, finding the rationale of *Brown* unpersuasive.[4]

Plaintiff basically contends RCW 46.08.080 irrationally singles out for adverse treatment the nonpaying automobile guest in a car driven on a public highway of this state; that such action violates equal protection because it does not have " '. . . a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' " *Reed v. Reed,* 404 U.S. 71, 76, 30 L. Ed. 2d 225, 92 S. Ct. 251 (1971); *State v. Perrigoue, supra.*

The object or justification for host-guest statutes as discussed by plaintiff following *Brown* are traditionally two: promotion of driver hospitality and prevention of collusion in automobile accident cases. First, the statute insulates "generous drivers from lawsuits instituted by ungrateful guests who have benefited from a free ride." Secondly, the statute helps eliminate "collusive lawsuits, in which a host fraudulently confesses negligence so as to permit his guest

---

[2]Cases from other jurisdictions in which a host-guest statute has been found to be constitutional include: *Silver v. Silver,* 280 U.S. 117, 74 L. Ed. 221, 50 S. Ct. 57, 65 A.L.R. 939 (1929), *aff'g* 108 Conn. 371, 143 A. 240, 65 A.L.R. 943 (1928); *Richardson v. Hansen,* 186 Colo. 346, 527 P.2d 536 (1974); *Justice v. Gatchell,* 325 A.2d 97 (Del. 1974); *Keasling v. Thompson,* 217 N.W.2d 687 (Iowa 1974); *Naudzius v. Lahr,* 253 Mich. 216, 234 N.W. 581, 74 A.L.R. 1189 (1931); *Miller v. Huizinga,* 23 Mich. App. 363, 178 N.W.2d 542 (1970); *Smith v. Williams,* 51 Ohio App. 464, 1 N.E.2d 643 (1935); *Duerst v. Limbocker,* 269 Ore. 252, 525 P.2d 99 (1974); *Tisko v. Harrison,* 500 S.W.2d 565 (Tex. Civ. App. 1973); *Cannon v. Oviatt,* ........ Utah ........, 520 P.2d 883 (1974).

[3]*Thompson v. Hagan,* 96 Idaho 19, 523 P.2d 1365 (1974); *Henry v. Bauder,* 213 Kan. 751, 518 P.2d 362 (1975); *Johnson v. Hassett,* 217 N.W.2d 771 (N.D. 1974).

[4]*Behrns v. Burke,* ........ S.D. ........, 229 N.W.2d 86 (1975); *Richardson v. Hansen,* 186 Colo. 346, 527 P.2d 536 (1974); *Justice v. Gatchell,* 325 A.2d 97 (Del. 1974); *Keasling v. Thompson,* 217 N.W.2d 687 (Iowa 1974); *Duerst v. Limbocker,* 269 Ore. 252, 525 P.2d 99 (1974); *Tisko v. Harrison,* 500 S.W.2d 565 (Tex. Civ. App. 1973); *Cannon v. Oviatt,* ........ Utah ........, 520 P.2d 883 (1974).

—presumably a friend or relative—to collect from the host's insurance company." *Brown v. Merlo, supra* at 864.

In support of her claim there is no constitutional justification for the statute's classification scheme, she argues (1) there is no rational basis for protecting the paying guest and withdrawing that protection from the nonpaying guest; (2) the increased use of automobile liability insurance coverage negates the idea that initiation of a lawsuit by an injured passenger constitutes an act of ingratitude toward the host driver; (3) the constitutionality of a statute predicated upon the existence of a particular set of facts when the statute was enacted may be challenged when those facts have ceased to exist—the case here; (4) analogizing from cases invalidating the doctrine of charitable immunity (*Friend v. Cove Methodist Church, Inc.*, 65 Wn.2d 174, 396 P.2d 546 (1964); *Pierce v. Yakima Valley Memorial Hosp. Ass'n*, 43 Wn.2d 162, 260 P.2d 765 (1953)), and from cases increasing the land-occupier's duty of care to licensees (*Potts v. Amis*, 62 Wn.2d 777, 384 P.2d 825 (1963); *Ward v. Thompson*, 57 Wn.2d 655, 359 P.2d 143 (1961)), and broadening the category of invitees (*McKinnon v. Washington Fed. Sav. & Loan Ass'n*, 68 Wn.2d 644, 414 P.2d 773 (1966)), plaintiff argues it is irrational to assume that, if a recipient of generosity is permitted to recover for negligently inflicted injuries, the cause of ingratitude will be served or the cause of hospitality disserved; (5) characterizing the initiation of a lawsuit by a guest as an act of ingratitude is inconsistent with the policy of RCW 46.29, the financial responsibility law, which is to insure compensation for all innocent car accident victims; and (6) the hospitality justification does not explain the different treatment of automobile guests as contrasted with that accorded other guests, *i.e.*, in airplanes, motorboats, and on private property.

Plaintiff also contends the collusion rationale does not justify the classification scheme. She argues (1) it is unreasonable to eliminate rights of action of all guests simply because some may file fraudulent lawsuits; (2) the statute

is unconstitutionally over inclusive because it penalizes guests who do not engage in collusion; (3) the statute is unconstitutionally under inclusive because a large number of persons who might pose a threat of collusion are permitted to escape by bestowing some minimal compensation on the host; (4) other exceptions in RCW 46.08.080 in light of RCW 46.08.030 are unrelated to the statute's hospitality and anticollusion objectives, *i.e.*, whether the automobile was on a private or public road, whether the driver was intoxicated, or whether the driver was grossly or ordinarily negligent. Some cases have rejected the increased possibility of fraud argument as a sufficient reason for preventing a change in law otherwise desirable. *Freehe v. Freehe, supra* (interspousal immunity); *Borst v. Borst*, 41 Wn.2d 642, 251 P.2d 149 (1952) (parental immunity).

We fail to find these arguments persuasive. They tend to show the legislation is unwise—a matter as to which the legislature has a right to its own views. To succeed in her contention that the statutory classification bears no rational relation to the object of the legislation, plaintiff must show no state of facts exists or can be reasonably conceived to exist that will justify the classification; that if the facts were originally sufficient, the facts at the time of the automobile accident in 1971 had so far changed as to render the classification irrational and, indeed, obsolete.

The last classification made by the legislature in the host-guest statute was about 18 years ago (Laws of 1957, ch. 132, p. 484) when the court restored the nonpaying guest's right of action for gross negligence in a host-guest automobile accident case involving the use of the public highways of the state. When chapter 132 was enacted, the presumption is facts existed to justify the classification. *Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n, supra*; *State v. Persinger, supra*; *Overlake Homes, Inc. v. Seattle-First Nat'l Bank*, 57 Wn.2d 881, 360 P.2d 570 (1961); *Clark v. Dwyer*, 56 Wn.2d 425, 353 P.2d 941 (1960); *cert. denied*, 364 U.S. 932, 5 L. Ed. 2d 365, 81 S.

Ct. 379 (1961). The record fails to show any material change by 1971 in the facts presumably existing when the 1957 amendment was enacted and when chapter 18 of Laws of 1933, page 145 was enacted.

*Shea v. Olson,* 185 Wash. 143, 53 P.2d 615, 111 A.L.R. 998 (1936), describes the facts which might have brought about the enactment of chapter 18 of Laws of 1933. The court said at pages 155-56:

From the information and knowledge had by the legislature upon the subject, that body may have concluded that this type of litigation had not only become vexatious, but had reached a point where it should no longer be encouraged or permitted; that it would reduce the number of reckless drivers if those who accepted their gratuities should exercise greater circumspection in their choice of hosts and the conditions under which a trip was to be made; that careful drivers who otherwise would be willing to extend a favor or gratuity were nevertheless deterred by the fear that, through some misfortune, they would be charged with gross negligence and be compelled to defend suits for exorbitant sums; that still others were too willing to misrepresent facts, or to permit them to be misrepresented unchallenged, with the result that unjust judgments were often obtained which the courts could not prevent; and finally, that, in the regulation of the state's highways, the legislature would assume its prerogative of imposing certain conditions under which the highways might be used, with the view of making them safer for all concerned.

The court concluded:

These were matters upon which the legislature could exercise its discretion, and with which the courts are not concerned. Such a state of facts may reasonably be conceived as having existed and to have been presented to, and considered by, the legislature. If so, then we believe that the legislature was justified in passing the measure that it did.

The court further concluded:

There was a reasonable basis for making a distinction between invited guests and paying passengers, and, as to all persons similarly situated, the law operated equally.

Hence, there was no denial of equal privileges or immunities.

(Citations omitted.)

In the absence of a showing by evidence or by judicial notice that the facts described in *Shea v. Olson, supra,* have substantially changed, we cannot say the statute is now so obsolete as to deprive the classification of a rational relationship to the object of the legislation. *Duerst v. Limbocker,* 269 Ore. 252, 525 P.2d 99 (1974). In fact, as late as 1972, the Supreme Court in *Freehe v. Freehe,* 81 Wn.2d 183, 500 P.2d 771 (1972), cited RCW 46.08.080, .085, and .086 as illustrating a permissible exercise of legislative power to deal with the problem of preventing fraud.

Moreover, it is useful in upholding RCW 46.08.080 to point out or reemphasize some significant differences between the law applied in *Brown v. Merlo,* 8 Cal. 3d 855, 506 P.2d 212, 106 Cal. Rptr. 388 (1973) and the law followed in Washington.

1. Such a recovery for gross negligence in host-guest automobile cases was permitted by decisional law prior to Laws of 1933, ch. 18, p. 145.[5] RCW 46.08.080 has permitted recovery for gross negligence since 1957. The California statute permits no such recovery. *Brown v. Merlo, supra* at 863 n.3. The Washington decisional rule requiring a showing of gross negligence in host-guest automobile accident cases was based upon the analogy drawn from the rule discussed in *Massaletti v. Fitzroy,* 228 Mass. 487, 118 N.E. 168 (1917), that one who gratuitously undertakes to perform an act is not liable for ordinary negligence but is liable for gross negligence. *Shea v. Olson, supra; Heiman v. Kloizner,* 139 Wash. 655, 247 P. 1034 (1926). Washington

---

[5] Even if the statutory classification were held unconstitutional, so as to permit resort to decisional law to determine liability, plaintiff could still not recover without a showing of gross negligence because Washington case law does not permit it. *Shea v. Olson,* 185 Wash. 143, 148, 53 P.2d 615, 111 A.L.R. 998 (1936). If the statute is constitutional, however, we need not determine whether prior decisional law should be overruled to permit recovery upon the finding of ordinary negligence.

still refuses a bailor recovery against his gratuitous bailee for ordinary negligence; he must show gross negligence. *Nist v. Tudor*, 67 Wn.2d 322, 407 P.2d 798 (1965). *Massaletti v. Fitzroy, supra*, was last cited with approval in *Falden v. Crook*, 342 Mass. 173, 172 N.E.2d 686 (1961).

 2. Notwithstanding the increased use of liability insurance, we still have the uninsured or underinsured motorist.[6] Moreover, the propriety of shifting the burden of increased insurance costs by removing the obstacle to recovery for ordinary negligence is a matter on which the legislature may have one view and the courts another. In such a case, it is within the competence of the legislature to

[6]In Washington in 1967, the only year for which figures are available in any publication, between 21 and 25 percent of private passenger cars were not insured. United States Department of Transportation Study *"Automobile Insurance and Compensation Study"* at page 205, Table I (October 1970). As of April 1, 1974, Washington had 2,145,283 licensed drivers. *The State of Washington Pocket Data Book 1974* at page 157. Many of these undoubtedly did not own passenger cars but the figures suggest that the number of uninsured passenger cars was very substantial.

Moreover, the presence of uninsured motorist coverage in liability insurance policies is common. In *California Uninsured Motorist Practice*, published by California Continuing Education of the Bar (1973), the preface states at page 7:

It has been estimated that approximately 20 percent of motorists are uninsured and that uninsured motorists account for a higher percentage of accidents than their numbers warrant. It has also been estimated that close to one-fourth of persons injured in automobile accidents will have uninsured motorist claims.

Moreover, even in the case of insured drivers, the fact that insurance exists does not mean that the insured driver does not resent suit by a nonpaying guest. Not only is the insured driver put to the trouble, inconvenience and distasteful necessity of cooperating in assisting and defending the litigation, thus diverting the insured from his normal pursuits—he also faces possible worry and expense in hiring counsel to defend himself against a possible verdict in excess of his policy limits; he is exposed to the possibility his insurance will be cancelled, if his policy permits such cancellation; and exposed to the possibility his policy may not be renewed or may not be renewed except at a higher premium cost.

These considerations have existed from the time the first host-guest statute was enacted in this state. It continued to exist when in 1957 the legislature restored the cause of action for gross negligence previously eliminated.

determine the rule of liability which is to govern.[7] *Duerst v. Limbocker, supra.*

3. Washington continues to adhere to the view followed in *Shea v. Olson, supra,* that if any state of facts can reasonably be conceived to uphold the legislation including the classification made therein, the legislation will be upheld. *Sonitrol Northwest, Inc. v. Seattle,* 84 Wn.2d 588, 528 P.2d 474 (1974); *Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n,* 83 Wn.2d 523, 520 P.2d 162 (1974); *State v. J-R Distribs., Inc.,* 82 Wn.2d 584, 512 P.2d 1049 (1973); *State v. Persinger,* 62 Wn.2d 362, 382 P.2d 497 (1963); *McGowan v. Maryland,* 366 U.S. 420, 426, 6 L. Ed. 2d 393, 81 S. Ct. 1101, 1153, 1218 (1961). *Brown* declined to accept that approach. *Brown v. Merlo, supra* at 865 n.7.[8]

---

[7] In a number of Washington statutes, the legislature has fixed the standard of care at something higher than ordinary negligence. These include a requirement of gross negligence. RCW 9.08.040; 9.48.120; 14.12.200; 18.04.300; 18.08.200; 18.43.110; 18.74.080; 18.90.060; 18.96.120; 19.48.030; 19.48.070; 20.01.330 (willful negligence); 21.24.050; 21.25.050; 38.52.180; 38.52.195; 41.40.200 (willful negligence).

[8] *Brown v. Merlo,* 8 Cal. 3d 855, 865 n.7, 506 P.2d 212, 106 Cal. Rptr. 388 (1973), cites with approval Gunther, *Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv. L. Rev. 1 (1972). Professor Gunther described his *Model for a New Equal Protection* as an "invigorated" rational basis test calling for a "modest interventionism." Under his model, a court "would be less willing to supply justifying rationales by exercising its imagination." He objects to "perfunctory judicial hypothesizing." 86 Harv. L. Rev. at 21. *Brown v. Merlo, supra,* stated, in effect, it was wrong to uphold legislation by a "totally unrealistic state purpose" when accomplished "by straining our imagination . . ."

Gunther, in his search for "evolving doctrine" in equal protection cases does not claim a statute may be declared unconstitutional merely because the court may believe it to be unwise. He does not suggest nor argue a statute is not still presumed constitutional. Accordingly, the state still has no burden to show the existence of a state of facts necessary to uphold the statute except in the suspect class and fundamental right violation cases. What Gunther asks is, is that the standard of review be more than minimal scrutiny but less than strict scrutiny in order to permit a "modest interventionism."

*Shea v. Olson,* 185 Wash. 143, 53 P.2d 615, 111 A.L.R. 998 (1936) did not uphold the 1933 host-guest statute by "straining its imagination" to support a "totally unrealistic state purpose." It expressly applied the rule that if any state of facts can "reasonably" be conceived to support

■ 4. Unlike *Brown, Shea v. Olson, supra,* cited and followed *Silver v. Silver,* 280 U.S. 117, 74 L. Ed. 221, 50 S. Ct. 57, 65 A.L.R. 939 (1929). *Silver v. Silver, supra* at 123-24, also pointed out:

> [T]here is no constitutional requirement that a regulation, in other respects permissible, must reach every class to which it might be applied—that the legislature must be held rigidly to the choice of regulating all or none. . . . It is enough that the present statute strikes at the evil where it is felt and reaches the class of cases where it most frequently occurs.

*See also Williamson v. Lee Optical of Okla., Inc.,* 348 U.S. 483, 99 L. Ed. 563, 75 S. Ct. 461 (1955); *Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n,* 83 Wn.2d 523, 531, 520 P.2d 162 (1974).

■ 5. The fact that in other areas of tort law the Supreme Court of Washington has not treated the increased possibility of fraud as significant, does not mean that the legislature may not have a different view of that matter in host-guest automobile cases. *Freehe v. Freehe, supra.* There is a difference between the standard to be

---

the statutory classification, it will do so. That principle was followed last year in a unanimous decision, *Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n,* 83 Wn.2d 523, 528, 520 P.2d 162 (1974). The court said:

> Every state of facts sufficient to sustain a classification which *reasonably* can be conceived of as having existed when the law was adopted will be assumed. . . . A statute's alleged unconstitutionality must be proven "beyond all reasonable doubt" before it may be struck down.

(Italics ours.) In any event, the Supreme Court decisions since Gunther's article was published have not adopted his proposed test. *See Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S. Ct. 1536, 39 L. Ed. 2d 797 (1974); *Citizens Comm. for Faraday Wood v. Lindsay,* 507 F.2d 1065 (2d Cir. 1974). In this case, the result reached would be the same even if the Gunther suggestion were adopted. A majority of the courts considering *Brown v. Merlo, supra,* including *Behrns v. Burke,* ........ S.D. ........, 229 N.W.2d 86 (1975) and cited in footnote 4 have refused to follow *Brown v. Merlo, supra.* They were obviously aware of Gunther's article cited and discussed in *Brown v. Merlo, supra* at 865 n.7. Apparently the "invigorated" rational basis test calling for a "modest interventionism" was deemed an insufficient reason for invalidating the host-guest statutes involved in those cases.

applied when the problem is overruling a common-law doctrine and the standard to be applied when the problem is to determine whether to nullify a statute. In *Aetna*, at page 530, the court properly pointed out: "[T]he legislature is allowed a wide discretion in the selection of classes." The court also pointed out at page 529 of the *Aetna* opinion: "[I]t is not the function of this court in the exercise of judicial review to second-guess the wisdom of legislative determinations." Moreover, cases refusing to follow *Brown* have pointed out that, if the host-guest law is to be changed, the change should be made by the legislature. *Richardson v. Hansen*, 186 Colo. 346, 527 P.2d 536 (1974); *Justice v. Gatchell*, 325 A.2d 97 (Del. 1974); *Keasling v. Thompson*, 217 N.W.2d 687 (Iowa 1974); *Duerst v. Limbocker*, 269 Ore. 252, 525 P.2d 99 (1974); *Tisko v. Harrison*, 500 S.W.2d 565 (Tex. Civ. App. 1973); *Cannon v. Oviatt*, _____ Utah _____, 520 P.2d 883 (1974). In Washington, after earlier changes, the legislature has now repealed RCW 46.08.080, .085, and .086 effective 90 days after the legislature adjourned, *i.e.*, July 24, 1974.

We conclude a finding of ordinary negligence is insufficient to permit recovery.

■ Plaintiff next contends that defendant Copeland was guilty of gross negligence as a matter of law. Notwithstanding prior difficulties of distinguishing between gross negligence and ordinary negligence in a host-guest case, gross negligence is now more clearly defined in *Nist v. Tudor*, 67 Wn.2d 322, 331, 407 P.2d 798 (1965), followed in *Zarling v. Stumbaugh*, 67 Wn.2d 405, 408 P.2d 17 (1965), as follows:

> great negligence, that is, negligence substantially and appreciably greater than ordinary negligence. Its correlative, failure to exercise slight care, means not the total absence of care but care substantially or appreciably less than the quantum of care inhering in ordinary negligence. In determining the degree of negligence, the law must necessarily look to the hazards of the situation confronting the actor.

Some cases merely determine whether there is sufficient

evidence of gross negligence to go to the jury or other trier of the fact. *Ketchum v. Wood*, 73 Wn.2d 335, 438 P.2d 596 (1968); *Tyler v. Tyler*, 65 Wn.2d 102, 395 P.2d 1021, 6 A.L.R. 3d 764 (1964); and *Pickering v. Stearns*, 182 Wash. 234, 46 P.2d 394 (1935). Other cases determine whether there is gross or ordinary negligence. *Dailey v. Phoenix Inv. Co.*, 155 Wash. 597, 285 P. 657 (1930); *Blood v. Austin*, 149 Wash. 41, 270 P. 103 (1928); *Saxe v. Terry*, 140 Wash. 503, 250 P. 27 (1926); *Elowitz v. Miller*, 265 Mich. 551, 251 N.W. 548 (1933); *Mater v. Becraft*, 261 Mich. 477, 246 N.W. 191 (1933).

In *Elowitz v. Miller*, 265 Mich. 551, 251 N.W. 548 (1933), the failure of an automobile driver to see a curve in the street in time to have safely slowed down to make the turn was held to be at most ordinary negligence.

In *Mater v. Becraft*, 261 Mich. 477, 246 N.W. 191 (1933), a guest was held not entitled to recover where neither the driver nor the guest saw the curve in the road, the driver apparently having become confused and misled by the lights of an oil station near the curve. The court held that the driver may have been negligent in driving too fast and not applying the brakes in time but this lack of care was at most ordinary negligence.

In the instant case, Copeland's negligence consisted in his failure to see the curve or the posted sign giving notice of the impending curve. He entered the curve at a speed of 50 miles per hour, the posted speed limit on the Newquist Road at the place the accident occurred. There was no warning the posted speed limit should be reduced. At most, it might be argued a fact issue existed as to whether the conduct here was gross negligence. That fact issue, however, was resolved against the plaintiff. The court found Copeland's negligence was ordinary negligence only. We cannot hold as a matter of law the court was required to find gross negligence.

Plaintiff then contends the court erred in excluding the state trooper's testimony concerning a statement made to him by a Copeland car passenger an hour after the acci-

dent. The state trooper testified the car passenger "was quite stable out there at the accident scene." He further testified that, at the hospital where the statement was made, the passenger "talked as normal as he would . . . not being involved in an accident." The passenger told him, "the last time that he [passenger] looked at the speedometer, just prior to the accident, he [defendant] was doing 60 mph." The court refused the testimony because it did not come within the res gestae exception to the hearsay rule.

*Robbins v. Greene*, 43 Wn.2d 315, 321, 261 P.2d 83 (1953), explains:

> The so-called *res gestae* rule is applied with respect to the admission of testimony concerning statements made by participants in a transaction or by other persons present thereat. The theory of the admission of such testimony is that the statement is made while the person is still under the influence of the act and before there is time for him to fabricate. It may be made in answer to a question, provided it is spontaneous and under circumstances which would negative the thought that it might have been made with design or premeditation.

*See also Beck v. Dye*, 200 Wash. 1, 92 P.2d 1113, 127 A.L.R. 1022 (1939).

██ The determination of whether the state trooper's testimony was admissible under the res gestae rule was within the sound discretion of the trial court. It was for the court to make a determination of whether the required elements described in *Robbins v. Greene, supra,* and in *Beck v. Dye, supra,* were present. We find no abuse. *May v. Wright,* 62 Wn.2d. 69, 381 P.2d 601 (1963); *Langer v. Auto Interurban Co.,* 28 Wn.2d 343, 183 P.2d 188 (1947); *Grant v. Oregon R.R. & Nav. Co.,* 54 Wash. 678, 103 P. 1126 (1909); 5 Meisenholder, Wash. Prac., *Evidence* § 491, at 474 (1965); Annot., 53 A.L.R.2d 1245, § 5, at 1260-62 (1957).

Plaintiff contends the court erred in "failing to consider" the opinion of the patrol officer investigating the accident concerning what would have been the reasonably safe speed prior to the accident at which the motor vehicle

could have successfully negotiated the curve. The opinion was received but the court explained why the opinion was not persuasive, saying:

> For example, in the experiment that he [the patrol officer] made with his car the day of his testimony he stated that he thought 30 miles an hour was the maximum safe speed for that corner under similar circumstances with a wet road, and then he amended that to 35; but in two places in his testimony he was reluctant to answer counsel's questions at all, saying in one place, "It's hard for me to answer that" (that had to do with whether the physical evidence bore out the speed), and in another place, when invited to discuss whether heavy or light cars are better able to negotiate curves, that he was "no expert on that." He repeated that statement in another place, although he was offered as an expert.

 A trial court has the right to reject expert testimony in whole or in part in accordance with its views as to the persuasive character of that evidence. In light of the court's explanation, we cannot say the court acted arbitrarily or capriciously in refusing to accept the evidence as to proper speed. *Sylvain v. Page*, 84 Mont. 424, 276 P. 16, 63 A.L.R. 528 (1929); *In re Estate of Patterson*, 333 Pa. 92, 3 A.2d 320, 120 A.L.R. 967 (1939).

Plaintiff contends the court misinterpreted the trooper's testimony dealing with the 35 mile per hour speed. The witness testified he did not remember talking to the insurance company's claim agent concerning the proper speed at which the Copeland vehicle should have been driven to negotiate the curve in the road, but it was possible he told the agent that "35 mph was a safe speed at the time." The court was empowered to draw reasonable inferences from that testimony. *N. Fiorito Co. v. State*, 69 Wn.2d 616, 419 P.2d 586 (1966); *Rognrust v. Seto*, 2 Wn. App. 215, 467 P.2d 204 (1970). One such inference it could draw was that had the witness held no such opinion he would not have admitted the possibility he had expressed it.

Copeland not being liable, we need not determine

whether Mid-Century Insurance Company's insurance policy covered the accident involved.

Affirmed.

STAFFORD, C.J., HAMILTON and WRIGHT, JJ., and REVELLE, J. Pro Tem., concur.

FINLEY, J. (dissenting)—Sound constitutional analysis must not turn upon talismanic invocation by the courts of factual and/or legal presumptions to uphold the constitutionality of the classifications established by a state statute. When the legislature enacts a statute, the classifications of which are not reasonable, rational, and just, it is an abdication of judicial responsibility to deny the constitutional right of citizens to equal protection of the laws, particularly by resorting to overly simplistic talk of judicial self-restraint and deference to legislative judgment. In my opinion, the majority has accorded an inordinate and undue deference to several such presumptions when, in fact, the archaic host-guest statute challenged herein can only be described as "unreason personified." Lascher, *Hard Laws Make Bad Cases—Lots of Them*, 9 Santa Clara Law. 1, 10 (1968). Accordingly, I dissent.

It has been said that the impetus for the enactment of host-guest statutes appears to have been the extensive lobbying efforts of insurance companies. *See* W. Prosser, *Handbook Of The Law Of Torts*, 186, 187 (4th ed. 1971); Allen, *Why Do Courts Coddle Auto. Indemnity Companies*, 61 Am. L. Rev. 77 (1927). Essentially and traditionally, two reasons have been advanced to justify such statutes. First, it is argued that drivers who gratuitously offer their hospitality should be protected from ungrateful suits by guests. Second, it is asserted that the host-guest statute aids in eliminating the possibility of collusive lawsuits in which the host fraudulently confesses negligence to permit an automobile guest passenger—presumably a friend—to recover from the host's insurance carrier.

Ostensibly in furtherance of these goals, RCW 46.08.080,

which is set forth in the majority opinion, in essence cre-
ates, somewhat arbitrarily, three classifications or catego-
ries for automobile-guest passengers. First, automobile
guests riding as nonpaying passengers are treated differ-
ently than paying passengers. Second, nonpaying passen-
gers are treated differently than nonpaying social guests in
other contexts, *e.g.*, passengers on airplanes and boats,
guests on real property, et cetera. Third, some injured but
nonpaying passengers are treated differently than other in-
jured but nonpaying passengers because (a) recovery is
not denied if the injury occurs on a private road, *Fleming
v. Mulligan*, 3 Wn. App. 951, 478 P.2d 754 (1970); (b)
recovery is not denied if the host was intoxicated; (c)
recovery is not denied if the accident was intentional or
due to the gross negligence of the host.

Plaintiff argues that these classifications are violative of
the equal protection clause of the U.S. Const. amend. 14
and Const. art. 1, § 12. Primary reliance is placed upon the
landmark California decision of *Brown v. Merlo*, 8 Cal. 3d
855, 506 P.2d 212, 106 Cal. Rptr. 388 (1973), which held the
California host-guest statute to be unconstitutional on
equal protection grounds.

Since neither a fundamental right nor a suspect classifi-
cation seems to be involved in this case, the validity of
RCW 46.08.080 depends upon whether the above classifica-
tions are rationally related to the ends sought to be
achieved, *i.e.*, protection of hospitality and prevention of
collusion. *See Reed v. Reed*, 404 U.S. 71, 30 L. Ed. 2d 225, 92
S. Ct. 251 (1971); *James v. Strange*, 407 U.S. 128, 32 L. Ed.
2d 600, 92 S. Ct. 2027 (1972). In applying this rational basis
test, the recurrent theme of the majority is that if *any* state
of facts can reasonably be conceived to uphold the legisla-
tion and the classifications made therein, then the legisla-
tion will be upheld. Reliance is placed upon such cases as
*McGowan v. Maryland*, 366 U.S. 420, 6 L. Ed. 2d 393, 81 S.
Ct. 1101 (1961); *Sonitrol Northwest, Inc. v. Seattle*, 84
Wn.2d 588, 528 P.2d 474 (1974); *Aetna Life Ins. Co. v.*

*Washington Life & Disability Ins. Guar. Ass'n,* 83 Wn.2d 523, 520 P.2d 162 (1974).

In times past, there was a strong tendency to recite this rather simplistic formula and then to promptly uphold the statutory scheme. *See* Gunther, *Foreword: In Search Of Evolving Doctrine On A Changing Court: A Model For A Newer Equal Protection,* 86 Harv. L. Rev. 1, 19 (1972). But it is now quite clear that invocation of the rational basis test does not automatically "suspend the operation of the Equal Protection Clause." *Hagans v. Lavine,* 415 U.S. 528, 539, 39 L. Ed. 2d 577, 94 S. Ct. 1372 (1974).

On the contrary, the Supreme Court has recently retreated from its earlier extreme deference to any imaginable facts supportive of a statutory scheme. The more recent cases do not assess the rationality of statutory classifications simply on the basis of whether *any* state of facts can reasonably be conceived to support the legislation. Rather, the court's current approach to the rational basis test has been aptly summarized in *Reed v. Reed, supra* at 76:

> A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a *fair and substantial relation to the object* of the legislation, so that all persons similarly circumstanced shall be treated alike." *Royster Guano Co. v. Virginia,* 253 U.S. 412, 415 (1920).

(Italics mine.) Numerous other recent cases have repeated the requirement that a classification must have a *fair and substantial* relation to the goals sought to be achieved. *See, e.g., Stanton v. Stanton,* 421 U.S. 7, 43 L. Ed. 2d 688, 95 S. Ct. 1373 (1975); *Johnson v. Robison,* 415 U.S. 361, 39 L. Ed. 2d 389, 94 S. Ct. 1160 (1974); *Kahn v. Shevin,* 416 U.S. 351, 40 L. Ed. 2d 189, 94 S. Ct. 1734 (1974); *Eisenstadt v. Baird,* 405 U.S. 438, 31 L. Ed. 2d 349, 92 S. Ct. 1029 (1972). *Cf. Weber v. Aetna Cas. & Sur. Co.,* 406 U.S. 164, 31 L. Ed. 2d 768, 92 S. Ct. 1400 (1972). Even when the court has not stated explicitly that the classification must have a fair and substantial relation to the goals to be achieved, it seems reasonably clear that the court implicitly has been employ-

ing a stricter equal protection standard. This is true, at least, if the challenged statute does not involve simply traditional economic regulations or social welfare legislation. This is manifest because, in marked contrast to earlier cases, the court has sustained without hesitation challenges to statutory schemes in which the classifications bear only a tenuous relationship to assertedly valid state purposes. *See, e.g., Weinberger v. Wiesenfeld,* 420 U.S. 636, 43 L. Ed. 2d 514, 95 S. Ct. 1225 (1975); *Jimenez v. Weinberger,* 417 U.S. 628, 41 L. Ed. 2d 363, 94 S. Ct. 2496 (1974); *Jackson v. Indiana,* 406 U.S. 715, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972); *James v. Strange,* 407 U.S. 128, 32 L. Ed. 2d 600, 92 S. Ct. 2027 (1972). *Cf. Humphrey v. Cady,* 405 U.S. 504, 31 L. Ed. 2d 394, 92 S. Ct. 1048 (1972).

In short, the old and rather rigid rational basis test has been liberated or invigorated to the extent it is no longer an instant and mechanical constitutional rubber stamp for legislative enactments. *See generally* Gunther, *supra* at 15-37. It may still be appropriate to give special deference to statutory classifications where the statute involves traditional economic regulations or social welfare legislation.[9] But if the challenged statute does not involve such economic regulations or social welfare legislation, the Supreme Court has clearly indicated that it is no longer willing to employ a totally fictional and mechanical approach to constitutional litigation by conjuring up or presuming theoretical facts and/or statutory purposes to support statutory classification schemes. In such situations, *i.e.,* where a suspect classification is not involved so as to trigger the com-

---

[9]For example, in *Dandridge v. Williams,* 397 U.S. 471, 25 L. Ed. 2d 491, 90 S. Ct. 1153 (1970), the court sustained the Maryland Aid to Families With Dependent Children Program which provided aid commensurate with need but limited the maximum grant to $250 per family regardless of size, thereby reducing the per capita expenditure for children in larger families. This decision was subsequently explained in *Jimenez v. Weinberger,* 417 U.S. 628, 41 L. Ed. 2d 363, 94 S. Ct. 2496 (1974), as being a case of "special deference" made necessary because, given the state's finite resources, its only choice was to support some families adequately and others less adequately or else not to provide sufficient support for any family.

pelling state interest test, but where the statute also does not involve traditional economic or social welfare legislation so as to trigger minimal scrutiny, it appears that an invigorated equal protection test is appropriate.

Moreover, apart from, and irrespective of, the changes in equal protection doctrine that apparently are occurring under the United States Constitution, pursuant to decisions of the United States Supreme Court, I would forthrightly adopt the newer equal protection analysis enunciated above under Const. art. 1, § 12, *i.e.*, the privileges and immunities clause. This provision is, of course, our analogue to the equal protection clause of the United States Constitution. This court has not equivocated or shown trepidation in the past in relying upon and applying provisions of our own constitution when it becomes necessary to modify the law in order to do justice. On the contrary, this court has previously recognized that " '[c]ourts have a creative job to do when they find that a rule has lost its touch with reality and should be abandoned or reformulated to meet new conditions and new moral values.' " *Ackerman v. Port of Seattle*, 55 Wn.2d 400, 407, 348 P.2d 664, 77 A.L.R. 2d 1344 (1960) (quoting Traynor, *Law And Change In A Democratic Society*, 1956 U. Ill. L.F. 230, 232). Furthermore, this court has forthrightly demonstrated judicial leadership in the development of constitutional law when appropriate and when necessary to modify the law to meet the needs of a changing society. *See, e.g., DeFunis v. Odegaard*, 82 Wn.2d 11, 507 P.2d 1169 (1973); *Carter v. University of Wash.*, 85 Wn.2d 391, 536 P.2d 618 (1975). I most certainly see no reason to retreat from that role of juristic leadership in the instant case.

Accordingly, in my judgment, irrespective of what the state of affairs may be regarding decisions of the United States Supreme Court interpreting the United States Constitution, analysis, interpretation, and application of the privileges and immunities clause of our Washington State Constitution should be modified. Thus, in cases where a suspect classification is involved, the compelling state inter-

est is still appropriate. In the area of economic and social welfare legislation, the older rational basis test, which involves minimal scrutiny, is appropriate. *See Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n,* 83 Wn.2d 523, 520 P.2d 162 (1974). But in other areas, where the nature of the interest involved is important but not fundamental, an "invigorated" rational basis test is appropriate under which a court should scrutinize reasonably closely the statutory schemes involved and the legislative classifications must have a fair and substantial relationship to the goals to be achieved. This latter test thus involves an intermediate degree of judicial scrutiny, *i.e.*, less scrutiny than when the compelling state interest test is appropriate but more scrutiny than under the traditional rational basis test.

In the instant case, the host-guest statute certainly does not involve merely traditional economic or social welfare legislation. On the contrary, it involves the right of an injured party to seek compensation for injuries which is a significant, albeit not fundamental, property right. *Cf. Cook v. State,* 83 Wn.2d 599, 521 P.2d 725 (1974) (Utter, J., concurring). Thus, it is manifest that the constitutionality of the host-guest statute should be assessed pursuant to the invigorated rational basis test. And this means that it should be analyzed not merely with extreme deference to hypothetical facts as the majority intimates, but rather, in terms of whether the classifications are *fairly and substantially related to the purposes* sought to be achieved. Such should be the test irrespective of whether the federal or Washington constitution is involved.

Before applying the rational basis test to this case, however, one further point must be stressed: the majority repeatedly contends that it is within the province of the legislature to lower the standard of care. Several statutes which allegedly do so are cited in support of this proposition. Most of these statutes are completely irrelevant, and

thus inapposite to this case,[10] but in any event, the legislature does not have absolute power and can lower the standard of care *only if to do so is rational* in view of the classifications made and the purposes to be served thereby. Whether this *particular* statute is rational is the critical question, and its rationality cannot be proved by rough analogies to other statutes whose schemes of classification and purposes have not even been stated or discussed by the majority. Rather, the rationality of the host-guest statute can be assessed only by a careful analysis of the purposes to be served and its schemes of classification.

As noted earlier, there are two commonly stated purposes to be achieved by the host-guest statute. The first such purpose is to protect the generous host's hospitality from the ingratitude of the guest. This argument apparently had its genesis in the economic conditions of the Depression. It was argued that the Depression was causing an increase in the number of hitchhikers who, it was feared, would likely take advantage of and sue their generous hosts. *See* Note, 59 Cornell L. Rev. 659, 664 (1974); Note, 18 Calif. L. Rev. 184 (1929).

It has been urged that protecting a host against the ingratitude of one he has injured is not even a valid state interest. *See* Lascher, *Hard Laws Make Bad Cases—Lots of Them*, 9 Santa Clara Law. 1, 17. But assuming arguendo that protection against ingratitude is in general a valid state interest, four factors persuade me that it is simply an

---

[10]The statutes are cited in footnote 7 of the majority opinion. Of all the provisions cited, only the ones in RCW 19.48 (innkeeper liability), RCW 21.24 (liability of a custodian of a minor), and RCW 38.52 (liability of state in maintaining emergency services and shelter against foreign attack) relate to the standard of care in a tort cause of action. RCW 9.08.040 and 9.48.120 simply define the requisite culpability or intent necessary for certain acts to constitute a crime. Every cited provision in Title 18 simply defines the amount of incompetence or type of behavior (including *inter alia* gross negligence) that will justify revocation or nonrenewal of certain professional businesses' licenses or certificates. The other provisions cited are similarly not relevant to the standard of care in a tort cause of action.

unrealistic fantasy to suppose that the host-guest statute substantially furthers this purpose.

First, it is highly dubious that instituting a lawsuit against a wrongdoer should even be characterized as ingratitude, since the lawsuit is most likely to be prompted not out of revenge but out of the practical necessity to pay medical bills and to recoup lost wages. The practical necessity of paying such bills is, of course, totally irrelevant to and does not negate any appreciation or gratitude one may have for the "lift" given to him by the driver of the motor vehicle.

Second, even if instituting a suit against a host once could have been validly characterized as constituting an act of ingratitude, it certainly cannot be so characterized today in view of the wide-spread availability of automobile insurance. In the late 1920's approximately only 20 percent of all drivers maintained automobile insurance. Elsbree & Roberts, *Compulsory Insurance Against Motor Vehicle Accidents*, 76 U. Pa. L. Rev. 690, 691 (1928). In contrast, today automobile insurance is the rule and not the exception. This change in facts is particularly significant since "a statute valid when enacted may become invalid by a change in the conditions to which it is applied." *Nashville C. & S. T. L. Ry. v. Walters*, 294 U.S. 405, 79 L. Ed. 949, 55 S. Ct. 486 (1935). *Cf. Stanton v. Stanton*, 421 U.S. 7, 43 L. Ed. 2d 688, 95 S. Ct. 1373 (1975). It may well be, as the majority suggests, that the uninsured driver is still to be found,[11] but the rationality of laws must be assessed with reference to the norm and not with reference to aberrations therefrom. Today, it is obvious that the collection of any judgment rendered in favor of an injured plaintiff likely will come from the coffers of the insurance company and not from the pocketbook of the host. Thus "[i]n plain language, there is

---

· [11]The only statistic available for Washington indicates that approximately 75-79 percent of vehicle drivers maintain insurance coverage. Department of Transportation, *Driver Behavior And Accident Involvement: Implications For Tort Liability* 205 (1970). The study did not investigate or attempt to make any adjustments for the possibility that some insured vehicles may be used solely on private property.

simply no notion of 'ingratitude' in suing your host's *insurer." Brown v. Merlo,* 8 Cal. 3d 855, 868, 506 P.2d 212, 106 Cal. Rptr. 388 (1973). *See also Thompson v. Hagan,* 96 Idaho 19, 523 P.2d 1365 (1974); *Henry v. Bauder,* 213 Kan. 751, 518 P.2d 362 (1974); *Johnson v. Hassett,* 217 N.W.2d 771 (N.D. 1974); *McConville v. State Farm Mut. Auto. Ins. Co.,* 15 Wis. 2d 374, 113 N.W.2d 14 (1962). Indeed, it might be more accurate to say that, rather than protecting against ingratitude, the host-guest statute actually engenders ingratitude and hostility because of the hard feelings and frustration likely to arise when the guest becomes encumbered with burdensome medical bills and perhaps permanent injury or disfigurement resulting from the host's negligence. And any effective recourse to the courts for consideration and adjudication of claims for relief is barred by the operation of the statute.

Third, the purpose of engendering or protecting hospitality simply does not rationally justify lowering protection for nonpaying passengers in automobiles. The hypothesis that generosity can rationally be served by lowering the protection to be afforded to the recipients thereof has been previously rejected by this court in *Pierce v. Yakima Valley Memorial Hosp. Ass'n,* 43 Wn.2d 162, 260 P.2d 765 (1953) and *Friend v. Cove Methodist Church, Inc.,* 65 Wn.2d 174, 396 P.2d 546 (1964), which abolished the doctrine of charitable immunity for paying and nonpaying patrons respectively. In *Pierce* at pages 173-74, this court observed:

> [M]en must be just before they are generous; . . . *the charitable nature of a tortfeasor cannot place it beyond the law* applicable to all; and that protection of life and limb by organized society is of greater importance to mankind than any species of charity . . ." 25 A.L.R. (2d) 29, 58, annotation.

(Italics mine.) This same principle is pertinent to the instant case. If generosity cannot justify lowering the protection for the patrons of charitable institutions, then

hospitality certainly cannot justify lowering the protection for nonpaying automobile passengers.

Finally, even if the protection of hospitality could justify the withdrawal of a guest's protection from injury, I can perceive no rationality in subjecting nonpaying automobile passengers to a greater risk of uncompensated injury than is faced by other nonpaying social guests. For example, there exists in Washington no host-guest statute with respect to nonpaying passengers in motorboats and airplanes and, thus, these passengers *are not forced* to suffer the increased risk of uncompensated injury at the hands of a negligent host. And even in the realm of land owner liability where some traditional albeit highly dubious distinctions still exist between the duties owed to licensees and invitees, our recent case of *Memel v. Reimer*, 85 Wn.2d 685, 538 P.2d 517 (1975), reduces the differences to a minimum and makes clear that the nonpaying injured guest on real property is accorded far more protection against ordinary negligence than is the nonpaying passenger in an automobile. If there is any rationality in singling out automobile guests under the guise of protecting hospitality and removing from this class of citizens the normal protections against negligence, it is not readily perceptible to me.

In sum, insofar as the purpose of the host-guest statute is to protect hospitality, I am convinced that the means adopted to effectuate this goal are *wholly irrational*. Therefore, if this statute is to withstand constitutional attack, its justification must rest on other grounds.

The second alleged justification for this statute is that it protects insurers from collusive lawsuits. This argument presumes that nonpaying passengers are likely to be close friends with the driver and that, in the event of an accident, it is likely the driver will falsely admit to being negligent to secure compensation for his injured friend. This theory also presumes that a paying passenger will be a stranger to the driver and that, in the event of an accident, the driver will have no reason to admit to his own negligence. To prevent the possibility of collusion with nonpay-

ing passengers, the statute eliminates *all* causes of action for ordinary negligence for such passengers. There are several defects, however, in this statutory scheme which convince me that the statute is not substantially related to the prevention of fraud or collusion.

First, this collusion rationale of the statute makes inconsistent assumptions. On the one hand, it assumes that the host will have such a desire to have his nonpaying guest compensated for injuries that he will falsely admit to his own negligence. But at the same time, this theory inexplicably assumes that, even though he wishes to have his guest compensated, the host (1) will *not* falsely admit to gross negligence and (2) will *not* falsely state that the guest paid him consideration for the ride which, of course, would remove the entire accident from the purview of the statute. Given the supposed desire of the host to have his guest compensated, such disparate assumptions are illogical, without reason and totally irrational. *See Brown v. Merlo, supra; Thompson v. Hagan, supra.*

Second and more importantly, the statute is blatantly both overinclusive and underinclusive. It is overinclusive because the nonpaying guest category, the members of which are deprived of their causes of action for ordinary negligence, broadly includes numerous individuals "such as hitchhikers, with whom the driver shares no close relationship and with respect to whom the danger of collusion is remote." *Brown v. Merlo, supra* at 875. The effect of the statute, therefore, is to impose its burden "upon a wider range of individuals than are included in the class of those tainted with the mischief at which the law aims." Tussman & tenBroek, *The Equal Protection Of The Laws*, 37 Cal. L. Rev. 341, 351 (1949). Our prior cases make clear that we take a dim view of such overinclusive classifications. For instance, in our cases abolishing interspousal tort immunity, *Freehe v. Freehe*, 81 Wn.2d 183, 500 P.2d 771 (1972), and parental immunity, *Borst v. Borst*, 41 Wn.2d 642, 251 P.2d 149 (1952), we have quite explicitly indicated that the mere opportunity for collusion in one class of cases "does

not warrant courts of law in closing the door to all cases of that class." *Borst v. Borst, supra* at 653.

In addition to being overinclusive, the host-guest statute is underinclusive because the paying passenger category—the members of which retain their causes of action for ordinary negligence—frequently includes close friends who share expenses through car pool arrangements. *Coerver v. Haab,* 23 Wn.2d 481, 161 P.2d 194, 161 A.L.R. 909 (1945). *See also Brown v. Merlo, supra.* But paying passengers who are close friends and who are not denied recovery pose no less a risk of collusion than does the nonpaying hitchhiker who is denied recovery. In addition, the statute is inapplicable if the injury occurs on a private road. *Fleming v. Mulligan,* 3 Wn. App. 951, 478 P.2d 754 (1970). But accidents occurring on private property pose no less of a risk of collusion than do accidents occurring on public highways. The effect of the statute, therefore, is to inexplicably permit suits for negligence by numerous citizens who are at least as likely to collude with the host as are the citizens barred from suing the host.

The majority apparently attempts to obviate the vices of overinclusiveness and underinclusiveness in the host-guest statute by relying on *Silver v. Silver,* 280 U.S. 117, 74 L. Ed. 221, 50 S. Ct. 57, 65 A.L.R. 939 (1929), and *Williamson v. Lee Optical of Okla., Inc.,* 348 U.S. 483, 99 L. Ed. 563, 75 S. Ct. 461 (1955) for the proposition that a statute designed to correct a particular evil need not reach every individual or class to which it might legitimately be applied, *i.e.,* corrective action may be taken one step at a time. This rule is well recognized, but it is not of unlimited application and cannot serve as a mandate for gross inequities. On the contrary, while some deviation from absolute equality is allowable, the classification scheme must nevertheless bear a *fair and substantial relation to the purposes* sought to be achieved. *Reed v. Reed,* 404 U.S. 71, 30 L. Ed. 2d 225, 92 S. Ct. 251 (1971); *Stanton v. Stanton,* 421 U.S. 7, 43 L. Ed. 2d 688, 95 S. Ct. 1373 (1975); *Eisenstadt v. Baird,* 405 U.S. 438, 31 L. Ed. 2d 349, 92 S. Ct. 1029 (1972). Thus,

where statutes have been enacted, ostensibly to prevent assertion of fraudulent claims, but which broadly impose their burden upon innocent parties, the Supreme Court has not hesitated to hold them violative of the equal protection clause. *See Glona v. American Guarantee & Liab. Ins. Co.,* 391 U.S. 73, 20 L. Ed. 2d 441, 88 S. Ct. 1515 (1968); *Gomez v. Perez,* 409 U.S. 535, 35 L. Ed. 2d 56, 93 S. Ct. 872 (1973). *Cf. Memorial Hosp. v. Maricopa County,* 415 U.S. 250, 39 L. Ed. 2d 306, 94 S. Ct. 1076 (1974). In my judgment, the gross overinclusiveness and underinclusiveness of the host-guest statute challenged herein also requires that it be held to be unconstitutional.

But in addition to the overinclusiveness and underinclusiveness of this statute, there are numerous alternatives available which adequately guard against the possibility of fraud in a less onerous and less sweeping fashion. For instance, there is a plethora of discovery techniques which may always be invoked to ascertain the truth. *See* CR 26, 27. Moreover, the jury system itself is designed "to ferret out the meritorious from the fraudulent" claims. *Borst v. Borst, supra* at 653. But even more importantly, there are several statutes which impose criminal sanctions for making fraudulent claims, RCW 48.30.230, for giving false testimony, RCW 9.72.010, RCW 9.72.030, and for offering false evidence, RCW 9.72.080. Even those who procure or attempt to procure others to commit perjury or offer false evidence are subject to criminal sanctions. *See* RCW 9.72.100; RCW 9.72.110. The existence of these alternative mechanisms which can cope with the possibility of fraud without destroying meritorious and nonfraudulent causes of action should remove any possible lingering doubt that the host-guest statute has exceeded the bounds of rationality. *See Johnson v. Hassett, supra* at 778; *Thompson v. Hagan, supra. Cf. Memorial Hosp. v. Maricopa County, supra.*

It is true that several states have recently upheld their respective host-guest statutes against constitutional attack. *See, e.g., Richardson v. Hansen,* 186 Colo. 346, 527 P.2d

536 (1974); *Justice v. Gatchell*, 325 A.2d 97 (Del. 1974); *Keasling v. Thompson*, 217 N.W.2d 687 (Iowa 1974); *Duerst v. Limbocker*, 269 Ore. 252, 525 P.2d 99 (1974); *Tisko v. Harrison*, 500 S.W.2d 565 (Tex. Civ. App. 1973); *Cannon v. Oviatt*, .......... Utah .........., 520 P.2d 883 (1974). But for the most part these cases display little analysis and simply rely upon a perfunctory recitation of presumptions and precedent established in another era under different conditions. I am persuaded that the Washington host-guest statute is wholly irrational and therefore unconstitutional. The better reasoned cases are in accord. *Thompson v. Hagan*, 96 Idaho 19, 523 P.2d 1365 (1974); *Henry v. Bauder*, 213 Kan. 751, 518 P.2d 362 (1974); *Johnson v. Hassett*, 217 N.W.2d 771 (N.D. 1974); *Brown v. Merlo*, 8 Cal. 3d 855, 506 P.2d 212, 106 Cal. Rptr. 388 (1973). *Cf. McConville v. State Farm Mut. Auto. Ins. Co.*, 15 Wis. 2d 374, 113 N.W.2d 14 (1962). Indeed, the Washington legislature has now repealed the host-guest statute, and thus it appears that the legislature itself has recognized that facts have changed since the inception of the statute which now make its continued operation in modern society totally irrational and unconstitutional. Only the vestigial remains of this archaic statute are left to harass the injured guest passenger in this case.

Therefore, I would overrule our older decision in *Shea v. Olson*, 185 Wash. 143, 53 P.2d 615, 111 A.L.R. 998 (1936), and hold RCW 46.08.080 to be unconstitutional as certainly violative of the Washington privileges and immunities clause and probably violative of the equal protection clause of the United States Constitution. For the same reasons, I would overrule the common-law doctrine extant in this state that a driver of an automobile is liable in damages to his invited guest only for acts of gross negligence. *See Shea v. Olson, supra* at 148 and cases cited therein. We should return to the majority rule at common law that the driver of a vehicle owes to a passenger the duty of reasonable care. *See* 2 F. Harper & F. James, *Law Of Torts* 950-51 (1956).

Accordingly, I would grant the plaintiff herein a new trial.

ROSELLINI and HUNTER, JJ., concur with FINLEY, J.

UTTER, J. (concurring in the dissent)—The majority and dissent have written scholarly and complete opinions upon which I cannot elaborate. While I am ordinarily willing to recognize the need for deference to the legislature in economic and social welfare legislation, it seems to me the court should be less willing to defer to legislative judgment when the classification was made many years ago and social and economic factors, which were the basis of the classification, have changed.

Courts have refused to defer to legislative judgment for this reason in a number of cases. In *Milnot Co. v. Richardson*, 350 F. Supp. 221 (S.D. Ill. 1972), the court held a classification which was once rational because of a given set of circumstances may lose its rationality if the relevant factual premise is totally altered. The United States Supreme Court in *Nashville, C. & St. L. Ry. v. Walters*, 294 U.S. 405, 79 L. Ed. 949, 55 S. Ct. 486 (1935), held that a statute valid as to one set of facts may be invalid as to another and a statute valid when enacted may become invalid by changing conditions to which it is applied. In *Leary v. United States*, 395 U.S. 6, 38, 23 L. Ed. 2d 57, 89 S. Ct. 1532 (1969), the Supreme Court held, in deciding the constitutionality of a legislatively enacted criminal statutory presumption, that the court also considers more recent data than that available when the presumption was enacted. The reason for so doing was "in order both to obtain a broader general background and to ascertain whether the intervening years have witnessed significant changes which might bear upon the presumption's validity." The court also noted that "[a] statute based upon a legislative declaration of facts is subject to constitutional attack on the ground that the facts no longer exist; in ruling upon such a challenge a court must, of course, be free to re-examine the factual declaration."

When courts apply the traditional equal protection analysis espoused by the majority and frequently applied by our court, the result is inevitably that no judicial review of the legislative action is granted. This may be wise in the majority of cases as legislative classifications cannot be drawn with absolute precision and play must be allowed for the joints of the legislative machine. "[L]egislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." *Missouri, K. & T. Ry. v. May*, 194 U.S. 267, 270, 48 L. Ed. 971, 24 S. Ct. 638 (1904). The challenge is for courts to recognize this and still reserve to themselves, where warranted, the exercise of their responsibilities as independent guarantors of the equal protection of the laws. The application of these two necessary, but sometimes conflicting rules, is certainly far from clear here and the change in conditions is not absolute but a matter of degree. I would hold, however, in light of the changing legal and social reasons since the statute's first enactment, that the classifications still existing in the statute are irrationally and inherently overbroad and underinclusive as stated in the dissent and the cases there cited. As such, there are grounds for finding a violation of the equal protection clause whether the traditional or invigorated tests are used to measure a violation of that clause.